WILLIAM C. ATWATER & COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 28296. Promulgated February 27, 1931.

*Leo H. Hoffman, Esq., John L. Steinbugler, Esq.,* and *Matthew F. Dorsey, Esq.,* for the petitioner.

*James L. Backstrom, Esq.,* and *P. A. Sebastian, Esq.,* for the respondent.

418

OPINION.

VAN FOSSAN: Petitioner's contention as to the statute of limitations is entirely disposed of by the case of *Stange* v. *United States*, 282 U. S. 270.

The second issue is whether or not the petitioner is entitled to deduct from its gross income during each of the years under consideration the sum of $15,000 as amortization of war facilities or as obsolescence. Section 234 (a) (8) of the Revenue Act of 1918 is as follows:

(a) That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(8) In the case of buildings, machinery, equipment, or other facilities, constructed, erected, installed, or acquired, on or after April 6, 1917, for the production of articles contributing to the prosecution of the present war, and in the case of vessels constructed or acquired on or after such date for the transportation of articles or men contributing to the prosecution of the present war, there shall be allowed a reasonable deduction for the amortization of such part of the cost of such facilities or vesels as has been borne by the

taxpayer, but not again including any amount otherwise allowed under this title or previous Acts of Congress as a deduction in computing net income.
* * *

Section 234 (a) (8) of the Revenue Act of 1921 is identical in effect and provides that the claim for amortization must be made at the time of filing the return for the taxable year.

The petitioner contends that the " processing " of coal as described in the findings of fact constituted the " production " contemplated by the statute and that coal itself was an article· contributing to the prosecution of the World War. The handling or treatment of run-of-mine coal received by the petitioner was merely a physical operation of segregating and mixing sizes and grades. The process in no wise altered the form or character of the coal. The coal was the, same article when it was sold to consumers as it was when it was delivered to the petitioner. Not every phase in the handling or treatment of an article which, in its original or transformed state, ultimately may have contributed to the prosecution of the war may be said to be a " production " of that article. In *Roden Coal Co.*, 5 B. T. A. 654, we held that the mining of coal is, in the economic sense, production. That decision was based on the theory that the bringing of the coal from the ground and making it fit for use by mining operations is the production of an article. In the case at bar the coal was merely a commodity transported, sorted, graded, combined and resold as a commercial venture. The activities of the petitioner may be termed a phase of distribution rather than a production.

In the *Roden Coal Co.* case the facts are quite different from those of the case at bar. The United States Fuel Administration ordered the Roden Coal Company to furnish large quantities of coal to the Southern Railway Company and the Louisville & Nashville Railroad System. The War Department placed orders for coal to be furnished to various military cantonments and camps. The coal company also furnished coal to steamship .companies under orders of the United States Fuel Administration. From 75 to 85 per cent of its entire output was so distributed. Under these circumstances we held that coal used for the purposes for which the Roden Coal Company output was used was an article which contributed to the prosecution of the war.

The petitioner in this case did not so dispose of its coal. It sold in the open market at the best prices obtainable. It had no contract with any branch of the Government nor was it ordered to sell its coal or any of the various sizes and grades thereof to consumers manufacturing war materials or engaged in war activities. It is

true that some of its sales were made to factories engaged, in part at least, in manufacturing war materials, such as hospital supplies, army equipment, etc., but the petitioner had no specific contracts with them for supplying their fuel. Those purchasers offered the best price for the commodity and petitioner supplied them just as a wholesaler sells its goods in the usual course of trade. In the record no distinction is drawn between war contractors and Government contractors, although the terms are far from synonymous. One of petitioner's customers had a Government contract for furnishing cotton cloth used for cleaning plates in the Bureau of Printing and Engraving. Such a use would not automatically be stamped as one contributing to the prosecution of the war.

As indicated, the petitioner itself made no direct use of the coal for war purposes and we are unable to determine to what extent any of its customers were so engaged. The impression is created by the evidence that much the larger part of the coal sold by petitioner was not even remotely connected with the prosecution of the war. Nowhere does it appear what proportion of sales made during the war period or thereafter were utilized directly or indirectly for war materials or contributed to the prosecution of the war. The petitioner sold more graded and sized coal, both bituminous and anthracite, than it did "mill coal," and apparently had no trouble in disposing of it profitably. During the early summer months of 1918 the sales of all classes of coal increased, but in August and September, 1918, it is observed that the sales lessened materially. The record is so confused and indefinite that it is impossible to determine what proportion of petitioner's business was normal commercial business and what related to the so-called war business.

The discharging tower completed in February, 1919, was erected to facilitate the handling of the petitioner's current business and for the anticipated future demands for all forms and grades of coal and not to provide specially for the sale of "mill coal" to factories manufacturing war materials. There is no evidence or indication that the petitioner was concerned in contributing to the prosecution of the war, in producing articles relating thereto, or in erecting a facility for the production of such articles.

In view of our decision it is unnecessary to determine the postwar value of the "facility" (the discharging tower) as a current asset utilized by a commercial concern.

The petitioner claims in the alternative that it is entitled to a deduction for the obsolescence of the discharging tower completed in February, 1919. This claim is made on the unique theory that obsolescence exists in a case " where the property turned out to be more

than adequate for the needs of the business and it is foreseen that its value to the taxpayer is less than the balance of the cost less ordinary depreciation resulting from wear and tear spread over the actual physical life of the property." In *Tennessee Fibre Co.*, 15 B. T. A. 133, we discussed at length the subject of obsolescence and held there that "obsolescence," as used in the statute, is the state or process of becoming obsolete and the provision allowing a deduction therefor is intended to care for losses of capital which take place over a longer period than the taxable year.

In the case at bar the element of obsolescence was not shown to have been present. We assume that the usual allowances were made for depreciation, wear and tear. No new or more modern machinery was being invented or used to replace its equipment. Only the ordinary repairs were necessary to insure its continued use as a modern and up-to-date facility such as would conform to the petitioner's present and future needs. Though the additional tower may have given petitioner an excess capacity, this fact does not establish obsolescence. We are of the opinion that petitioner is entitled to no deduction on the ground of obsolescence.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

---

TRAMMELL: In my opinion, after reaching the conclusion that the petitioner was in effect engaged in a phase of distribution rather than "production" of an article, the remaining discussion as to articles contributing to the prosecution of the war is dictum and not necessary for the decision. I think this discussion takes an entirely too narrow view and I am unable to concur in the reasoning.